[Civ. No. 160.   Third Appellate District.—May 15, 1906.]

# BANK OF YOLO, Appellant, v. BANK OF WOODLAND et al., Respondents.

ORDER TO PAY MONEY TO BECOME DUE—SUPPORT OF FINDING AS TO CONSIDERATION—REVIEW OF EVIDENCE.—Where an order was drawn in favor of the respondent bank by a charterer of vessels, who was indebted to the bank, upon a person who was to advance money to the charterer, collect commissions and profits and account finally to the charterer, and was accepted by such person, and a finding that the order was upon sufficient consideration was assailed as contrary to evidence that respondent bank agreed to advance money upon shipments, and failed to do so, but the testimony of the charterer upon that subject conflicted with that of the cashier of the respondent bank, the evidence must be construed in the light most favorable to the findings and judgment in favor of such bank, and the finding assailed cannot be disturbed upon appeal.

ID.—BURDEN OF PROOF NOT SUSTAINED—CONSIDERATION OF ORDER—PRE-EXISTING DEBT.—The burden of proof was upon the appellant to establish a want of consideration for the order; and the pre-existing debt of the drawer to the respondent bank being a sufficient consideration to support it, appellant's burden of proof was not sustained, where the evidence of the cashier of respondent bank was sufficient, aside from the note of the drawer introduced in evidence, to establish his pre-existing debt to the bank, notwithstanding the impression of the drawer that he owed nothing to the bank.

ID.—NOVATION—CONDITIONAL PAYMENT—IMPLIED EXTENSION OF TIME. Though the accepted order was not negotiable, it was a valid contract, having all the earmarks of a novation, and was, at least, a conditional payment of part of the pre-existing debt of the drawer to the bank, and respondent, by accepting it, impliedly agreed to extend the time for payment of such debt until the balance due to the drawer of the order could be finally ascertained; and the detriment to the bank and benefit to the drawer of the order was a sufficient consideration for the order.

ID.—EFFECT OF ORDER—ASSIGNMENT OF RIGHTS.—The order operated as an assignment to respondent bank of whatever moneys might become due as commissions or profits upon the charters held by the drawer, and the vested interest of the drawer in the charters, address commissions and profits of the cargo, was a tangible, existing and assignable property right.

3 Cal. App.—36

ID.—VALIDITY OF ASSIGNMENT—CERTAINTY—SPECULATIVE PROFITS.—
The validity of the assignment was not affected by the fact that
no particular amount was specified for the order, since the mode
of ascertaining such amount clearly appears.   Nor was its validity
affected because the vested interest of the assignor in any profits
realized on the sale of the cargoes was in a measure speculative.
The rights and things in action arising out of the agreement of
the drawer with the acceptor, including the profits derivable there-
under, were capable of assignment.

ID.—RIGHTS RESTING UPON CONTRACT WITH CHARTERER—ABSENCE OF
LIEN—PRIORITY OF RIGHTS TRANSFERRED.—In the absence of any
levy or legal process, neither appellant nor respondent could have
any claim to or lien upon the address commissions or profits save
through contract with the charterers, and the respondent bank
which first obtained a legal transfer of the rights of the charterer
therein was first in right thereto.   It is immaterial by whom the
shipments of cargo were made, nor who furnished the money to
buy it; and the mere fact that appellant bank furnished the bulk
of the cargo could give it no lien upon the charter, or upon the
balance of commissions and profits due from the acceptor of the
order to the charterer, as the result of the venture.

ID.—LOSS OF LIEN—PAYMENT—SURRENDER OF RECEIPTS—INDICIA OF
OWNERSHIP.—Conceding that appellant retained a lien while hold-
ing the mate's receipts, given in lieu of warehouse receipts of grain
loaded, such lien ceased when, upon acceptance of payment per
cental for grain furnished for shipment from him who had agreed
with the charterer to make such advance, and to sell the cargo, the
mate's receipts were surrendered to him, and who, being thus
clothed with all the *indicia* of ownership, sold the cargo in bulk,
and so disposed of the proceeds, as agreed with the charterer, that
no particular part of the balance in his hands could be identified
as proceeds of appellant's grain.   Under such circumstances, appel-
lant could have no legal or equitable lien on such balance, at com-
mon law or under the code.

ID.—NOTICE OF ORDER NOT REQUISITE—CIRCUMSTANCES EXCUSING NO-
TICE.—The respondent bank was not bound to notify appellant
bank of the order held from the charterer on the acceptor, merely
because respondent knew that appellant was backing the charterer
in the loading of the ships, where from respondent's knowledge of
the agreement between the charterer and the acceptor that the
latter would advance ninety-five cents per cental on all grain
loaded, respondent was justified in assuming that appellant would
hold its receipts for grain unless satisfied to take that amount to
part with them.   Under these circumstances, respondent was not
charged with knowledge that appellant would suffer detriment
by reason of its assistance to the charterer in loading the ships.

ID.—APPELLANT PUT UPON INQUIRY.—Where appellant knew, from the outset, that respondent might claim part of the balance due from the charterer, prudence dictated inquiry as to the nature and extent of respondent's claim; and appellant was not excused for its failure to make such inquiry because mistaken as to the basis of the claim.

ID.—HARMLESS OMISSION IN FINDING—ADVERSE EVIDENCE.—Where, under the evidence, it appears that any finding upon issues as to defensive matter raised by the answer of the appellant must have been adverse to the appellant, no injury resulted to appellant from failure to find thereupon.

ID.—HARMLESS ERROR IN EVIDENCE.—An error in the admission of evidence of a fact not essential in the case, a finding of which in favor of the appellant, if supported by uncontradicted evidence, would not change the result, is harmless.

APPEAL from a judgment of the Superior Court of Yolo County, and from an order denying a new trial. E. E. Gaddis, Judge.

The facts are stated in the opinion of the court.

A. C. Huston, and E. R. Bush, for Appellant.

N. A. Hawkins, for Respondents.

McLAUGHLIN, J.—This action was brought to recover the sum of $2,713.65 from the defendant Evans, and to have it adjudged that the other defendants had no claim to or interest in said sum. Evans deposited the money in court to abide the result of the controversy between the banks, and the action as to him was dismissed. The Bank of Woodland, in its answer, denied the averments of the complaint, and by way of cross-complaint set forth its right to the money, and Simpson answered denying generally the averments of both the complaint and cross-complaint. The court rendered judgment that the plaintiff was entitled to $183.54 of the sum so deposited, and the respondent bank to the remainder, and to costs. The plaintiff appeals from the judgment, and from an order denying its motion for a new trial.

The following facts are gleaned from the evidence, construed, as it must be, in the light most favorable to the findings and judgment.

The defendant Simpson made an agreement with defendant Evans, and through the agency of the latter, at some time prior to December 11, 1900, chartered two ships named, respectively, "The Anglessey" and "The Shenandoah," for the purpose of loading the same with cargoes of grain for sale and shipment to England. The terms of the charter-party, as far as they relate to commissions to become due to Simpson, provided for a commission of five per cent, one-half of which was payable at the time the charter-party was executed, and the other half at the port of discharge. The first installment was called the "charter commission" and the second the "address commission." On December 10, 1900, Simpson executed and delivered to respondent an order requesting Evans to pay any balance that might be due him on final settlement of the "Anglessey" and "Shenandoah" shipments, including charter commissions collected for his account, to the respondent. On the following day this order was presented to and indorsed and accepted in writing by Evans. At the time it was drawn and accepted, Simpson was indebted to the respondent in the sum of about $20,000, the payment of all of which, save about $3,000, was secured. The order was taken as additional security for this indebtedness, and no money was advanced to Simpson at the time it was drawn. The indebtedness of Simpson to respondent at the time this action was commenced had been reduced to the amount of respondent's judgment herein. When the order was executed and delivered, there was no agreement between respondent and Simpson, whereby the former was to "finance the cargoes," or furnish money to buy grain to load the ship. Respondent had furnished the money to buy grain to load two other ships which had been loaded before the "Anglessey" and "Shenandoah," but refused to make advances to buy wheat to load the ships named. After the refusal to make such advances, and after the order was accepted, respondent, through its cashier, learned that appellant was helping Simpson on the cargoes of the "Anglessey" and "Shenandoah." That official knew when the order was taken that it would be valueless unless the ships were loaded and cleared. He had no knowledge as to how Simpson was to load the ships, but thought Evans would see him through if nobody else did. He was shown a letter

by Simpson dated November 10, 1900, wherein Evans agreed to advance ninety-five cents per cental on wheat loaded, and to collect advances and "address commissions" for Simpson's account, through London friends, and to render a final account to him. Respondent never notified appellant that it held the order, and the latter knew nothing of its existence until after the wheat had been loaded on the ships. Respondent never "financed a cargo" for Simpson. In their dealings, the latter would buy the grain, and turn in the warehouse receipts to secure the amount of the check drawn in payment therefor, which was then paid by respondent. Simpson had some grain hypothecated to respondent which was loaded on the ships named. Of the grain loaded on the "Anglessey" respondent furnished 398,744 pounds, the appellant 2,219,332 pounds and the Yolo County Savings Bank 473,854 pounds. Of the grain loaded on the "Shenandoah" respondent furnished 25,854 pounds, appellant 6,230,720 pounds, and one Cerkel 4,854 sacks. Early in December, 1900, Simpson agreed with appellant that if the latter would advance the money necessary to load the two ships he had chartered, all moneys realized from the cargoes "except a *small pro rata that might be due to the Bank of Woodland"* would be paid to appellant. In buying wheat from the farmers Simpson paid for the same by issuing checks, to which the warehouse receipts, indorsed by the holders, were attached, and the checks so given were honored by appellant upon delivery of the receipts. The wheat was shipped to Port Costa by appellant, in whose name it was held, and, as it was loaded on the vessels, the mate issued receipts therefor in lieu of the warehouse receipts. After it was all loaded appellant was paid ninety-five cents per cental on the mate's receipts, which were taken up by and delivered to Evans, who in turn surrendered them when the bill of lading was issued. Some of the wheat delivered by appellant cost more and some less than ninety-five cents per cental, but freight charges and other expenses included, Simpson was indebted to appellant in the sum of about $4,000 on account of the transaction after Evans paid appellant ninety-five cents per cental for the wheat furnished. After the "address commissions" were paid, Evans had in his hands $2,713.60 which was payable to Simpson or his assignees. On January 8, 1901, the cashier of

appellant bank mailed a letter to Evans in which he said: "I have given the Grangers' Business Association authority to collect ninety-five cents per cental on all mate receipts not yet delivered to you, and an additional twenty-five cents on each ton of our wheat on ship 'Shenandoah.' Any payments yet to be made on account of ships 'Anglessey' and 'Shenandoah' to be made directly to this bank." Upon this letter Simpson under his signature indorsed his concurrence in such agreement.

It does not clearly appear when the loading of the ships was commenced. The agent who acted for Evans in the matter could not state positively whether it commenced in November or December, nor could he state how far it had advanced when the order relied upon by respondent was presented. In one part of his testimony Simpson stated that he could not say whether any wheat had been loaded at that time, and in another that all the wheat from Woodland was loaded afterward. It appears that on December 1st, 4,854 sacks of wheat worth $5,997.31 were purchased from one Cerkel; that this wheat was shipped on the "Shenandoah" and that the first wheat purchased by appellant for loading the ships was purchased on December 11th. There is nothing to show when the wheat purchased by the Yolo County Bank of Savings was purchased or loaded. The loading was completed during the first week of January, 1901.

It is contended that the evidence is insufficient to support the finding that the order given to respondent was supported by a sufficient consideration. This contention is based primarily on the proposition that respondent agreed to furnish money to purchase the grain for loading the ships, if the order was given, and that it failed to fulfill such agreement. It cannot be doubted that Simpson's version of the understanding had with respondent at the time the order was given is at variance with the version of the respondent's cashier, but it is well settled that when the evidence is conflicting the finding cannot be disturbed. (*Astill* v. *South Yuba Water Co.,* 146 Cal. 57, [79 Pac. 594]; *Broder* v. *Conklin,* 121 Cal. 284, [53 Pac. 699]; *Carteri* v. *Roberts,* 140 Cal. 165, [73 Pac. 818]; *People* v. *Wong,* 110 Cal. 121, [42 Pac. 420].) It is argued in this connection that as the order was given as collateral security for a pre-existing indebtedness, there was no consideration to support it. This court, however, is not at liberty to depart

from the contrary rule which has prevailed in this state for many years. (Civ. Code, sec. 1606; *Hart* v. *Church,* 126 Cal. 480, [77 Am. St. Rep. 195, 58 Pac. 910]; *Frey* v. *Clifford,* 44 Cal. 342; *Payne* v. *Beasley,* 8 Cal. 267, [68 Am. Dec. 318]; *Sackett* v. *Johnson,* 54 Cal. 109; *Russ* v. *Muscupiabe,* 120 Cal. 532, [65 Am. St. Rep. 186, 52 Pac. 995].) The order was an assignment of whatever moneys might become due to Simpson as commissions or profits from the charters he then held. The fact that no particular amount is specified does not affect its validity, for the method of ascertaining such amount clearly appears. (Civ. Code, sec. 1619 et seq.) True, it was not negotiable, but it is, nevertheless, a valid contract, having all the earmarks of a novation. (Civ. Code, secs. 1530, 1531, 1532; *Wolters* v. *Thomas* [Cal.], 32 Pac. 565; *Joyce* v. *Wing Yet Lung,* 87 Cal. 424, [25 Pac. 545]; *Wheatley* v. *Strabe,* 12 Cal. 92, [73 Am. Dec. 522].) It was at least a conditional payment of a part of Simpson's debt, and respondent, by accepting it, impliedly agreed to extend the time of such payment until the amount of the balance due from Evans to the drawer could be ascertained, and this could only be after payment of the address commissions. Indeed, we do not see how the respondent could proceed against Simpson for any portion of the debt due by him to the bank, until the balance was at least ascertainable, for it certainly could not prove that there was any balance due from the drawer until the third party, who was bound by his acceptance of the order, had received the address commissions and struck a balance, or had been afforded an opportunity to do so. We think the bank clearly suffered a detriment, and that a distinct benefit was conferred on Simpson, and this was a sufficient consideration. (Civ. Code, sec. 1605.) The burden was upon appellant to show a want of consideration, and this it did not accomplish, for the testimony of respondent's cashier is alone sufficient to show a subsisting indebtedness aside from the note introduced in evidence, notwithstanding Simpson's *impression* that he owed nothing. (Civ. Code, sec. 1615.)

It is next contended that, at the time the order was given, there was nothing in existence capable of transfer or assignment, and in the same connection it is urged that in no event could there then be an assignment of anything owing from Evans to Simpson on account of any wheat furnished by

appellant. If it be conceded that no wheat owned by appellant had been loaded when the order was given, and that Simpson could not transfer any money which might thereafter become due to appellant on account of wheat furnished and loaded, still we think Simpson then had substantial, tangible property rights which could and did pass by assignment. The balance due on final settlement, including charter commissions collected on Simpson's account, alone was assigned, and certainly appellant could then have had no legal claim to such balance. Simpson then held the charters, and the Cerkel wheat, at least, had been loaded. The loading of the ships was practically insured by Evans' agreement to advance the approximate market value of wheat to whomsoever might furnish it. The charterer then had a vested interest in the charter and address commissions, and this was certainly a tangible, existing, substantive, assignable property right. Under his agreement with Evans, Simpson also had a vested interest in any profits realized on the sale of the cargoes, and this, while in a measure speculative, was nevertheless an assignable interest. The rights and things in action arising out of the agreement with Evans, including the profits which would or might be derived therefrom, were in themselves capable of assignment. (Civ. Code, secs. 954, 1458; *La Rue v. Gassinger,* 84 Cal. 282, [18 Am. St. Rep. 179, 24 Pac. 42]; *Simmons v. Zimmerman,* 144 Cal. 260, [79 Pac. 451]; *Pierce v. Robinson,* 13 Cal. 122; *Bipend v. Liverpool etc. Ins. Co.,* 30 Cal. 86; *Bergson v. Builders' Ins. Co.,* 38 Cal. 544.) It mattered not by whom the wheat to load the ships was furnished, nor who furnished the money to buy it, Simpson would still be entitled to charter and address commissions, as well as the net profits arising from the sale of the cargoes. In the absence of any levy of legal process, neither appellant nor respondent could have any claim to or lien upon such commissions or profits save through a contract wth Simpson. If there was no assignment to either appellant or respondent, then Evans would be bound to pay any balance in his hands to Simpson. This seems to be admitted, but whether admitted or not, it stands out as a central, pivotal, incontrovertible fact in this case, from which it follows by simple force of logic that the party who first obtained a legal transfer of his claim or interest in such balance is entitled thereto. As respondent was first in time, it was first in right, unless by

force of some legal or equitable rule its right was destroyed
or postponed by virtue of the subsequent agreement and acts
of appellant and the conduct of respondent with regard there-
to. This brings us to a consideration of the lien claimed by
appellant. If we understand the argument on this point,
appellant claims a lien on this fund by virtue of the fact that
it furnished the bulk of the cargo loaded on each ship. This
fact alone certainly could not, and did not, create a lien on
the charter or address commissions, nor on the proceeds of
the sale of the grain which it did not furnish. Nor can we
conceive how it could operate to create a lien on any portion
of the balance due Simpson from Evans as a result of the
venture. Conceding that appellant retained a lien after the
warehouse receipts had been surrendered, and during the
time the mate's receipts were retained, we think such lien
ceased to exist when appellant received ninety-five cents per
cental for grain furnished, and delivered the last-mentioned
receipts to Evans. Having accepted the approximate market
value of the grain, and clothed Evans with every *indicia* of
ownership and right of possession, it retained no evidence or
vestige of right to control the property or the proceeds of its
sale. Not even the right of stoppage *in transitu* remained,
and the grain was commingled in the common mass composing
the cargoes. It was apparently sold in England with other
portions of the cargo, indiscriminately, and there is nothing
in this record from which it can be ascertained that any defin-
ite balance of the purchase price of any part of the cargoes
of wheat remained unpaid. No particular portion of the
balance in the hands of Evans has been or could be identified
as the proceeds of the sale of appellant's wheat, or of the
cargoes in bulk, for such balance is less than the charter and
address commissions earned, and, inferentially at least, it ap-
pears that such balance consists of what remained of such
commissions after payment of certain charges. Under such
circumstances, appellant could have no legal or equitable lien
on such balance at common law or under the code. (Civ.
Code, secs. 2872, 2875, 2988, 3049; Jones on Liens, secs. 800,
806, 811, 812, 818; *Eads* v. *Kessler*, 121 Cal. 246, [53 Pac.
656].)

It is said that the agreement between Simpson and appel-
lant gave the latter a contract lien on both cargoes, but our
construction of such agreement, and the letter indorsed by

Simpson subsequently sent by appellant to Evans, is that Simpson simply assigned to appellant the profits of the venture, less any *pro rata* due respondent, and that any sum received was to be applied to the satisfaction of a subsisting indebtedness.

It is very evident that appellant did not rely on such agreement for security, for throughout the entire transaction it retained the receipts which evidenced its ownership of the grain, and only surrendered them when Evans paid a sum which, under the evidence, was apparently equivalent to the price paid therefor.

Finally, it is urged that respondent was bound to give appellant notice that it held the order, because it knew that appellant was backing Simpson in loading the ships. Our attention has been called to no law requiring such notice, unless the rule embodied in subdivision 3, section 1963, of the Code of Civil Procedure, had such effect. Respondent had seen the letter from Evans wherein he agreed to advance ninety-five cents per cental for wheat loaded, and was justified in assuming that appellant was pursuing the usual methods followed in such transactions, by taking the receipts as security for the money advanced, and that appellant would not surrender the receipts unless the sum paid by Evans was sufficient to reimburse appellant for money advanced on such security. Under these circumstances, respondent was not charged with knowledge that appellant was altering its condition, or would suffer detriment by reason of assistance rendered Simpson in loading the ships, and hence the rule invoked has no application. Besides, appellant knew from the outset that respondent might claim a part of the balance due Simpson, and prudence dictated inquiry as to the nature and extent of such claim. True, it was suggested by Simpson that this claim would be for money due as a *pro rata* on a little wheat put aboard the ships by respondent, but appellant, having knowledge that there was a claim, cannot excuse its failure to make inquiry by setting up the fact that it was mistaken as to the basis upon which such claim would rest.

Reversal is asked on the ground that the court failed to find on defensive matter pleaded in the answer to the cross-complaint, but we think appellant was not prejudiced by any failure in this regard. The court found all the facts relat-

ing to the assignments made by Simpson to appellant and respondent, and it sufficiently appears therefrom that each assignment was supported by a sufficient consideration. We have seen that appellant's ignorance of the existence of the order did not affect respondent's rights under it, and that appellant did not retain possession of the wheat after the receipts evidencing possession and ownership were surrendered. What has been said also clearly indicates that under the facts proven, the appellant had no lien on any part of the money due Simpson on final settlement, and that its lien on the wheat ended when the mate's receipts were surrendered to Evans. From this it follows that under the evidence any finding in this regard must have been adverse to appellant, and hence no injury resulted to it from a failure to find on such issues. (*People* v. *Center,* 66 Cal. 564, [5 Pac. 263, 6 Pac. 481] ; *In re Conners,* 110 Cal. 413, 42 Pac. 906; *Krasky* v. *Wollpert,* 134 Cal. 342, [66 Pac. 309] ; *Murphy* v. *Bennett,* 68 Cal. 530, [9 Pac. 738].)

Error is predicated on the admission of the testimony of the president of the respondent bank, to the effect that neither the cashier nor any other agent of the bank had been given authority to finance the vessels or to buy wheat for the purpose of loading them. His testimony, as far as it related to any authority proceeding from him, was certainly competent, and conceding that the portion of the answer relating to lack of authorization by the board of directors was not the best evidence, we cannot see how such answer resulted in prejudice to appellant. The cashier who dealt with Simpson did not claim to have any such authority. In fact, he denied *in toto* that any such agreement had been entered into. His authority, or lack of it, was not an essential fact in the case, and if a finding in appellant's favor on this point was supported by uncontroverted evidence, the result would not be changed. Therefore, the ruling, if erroneous, was harmless. (*Carter* v. *Meuli,* 122 Cal. 367, [55 Pac. 138] ; *Dauphiney* v. *Red P. Co.,* 123 Cal. 550, [56 Pac. 451] ; *Duffy* v. *Duffy,* 104 Cal. 607, [38 Pac. 443] ; *Chapen W. Co.* v. *Chapman,* 144 Cal. 373, [77 Pac. 990].)

The judgment and order are affirmed.

Buckles, J., and Chipman, P. J., concurred.