[Civ. No. 8189. First Appellate District, Division One.—November 23, 1932.]

E. A. WM. BAUMGARTEN, Respondent, v. CALIFORNIA PACIFIC TITLE AND TRUST COMPANY (a Corporation) et al., Defendants; GEORGE PEAK, Appellant; AXEL A. JOHNSON et al., Interveners.

652

A. Don Duncan for Appellant.

Arthur L. Shannon for Respondent.

Bianchi & Hyman for Interveners.

THE COURT.—After a further consideration of the merits of this appeal upon rehearing, we have concluded that the opinion written by Mr. Justice *pro tem.* Ogden and filed herein on September 28, 1932, expresses the pres-

ent opinion of this court in determining the issues presented on the appeal. Said opinion is therefore adopted as the opinion and decision of this court, and is as follows:

"This action arises out of a controversy involving several conflicting claims to a sum of $16,500 held in escrow by the defendant California Pacific Title and Trust Company, a corporation, which will for the sake of brevity be hereinafter referred to as the title company. The trial court, after deducting the expenses of escrow, awarded the entire balance of the fund to the respondent. From this judgment the defendant and cross-complainant George Peak has appealed. None of the other parties to the action below, except the interveners Johnson and wife, have appealed and as the appeal of the latter has been dismissed, we are concerned on this appeal only with the respective claims to the fund of the appellant and the respondent.

"Respondent claims the fund as assignee thereof of the Blackmore Investment Company, a corporation. Appellant bases his claims thereto both as assignee and as a judgment creditor of the same company. Both the purported assignment and the levies of execution upon which appellant's claims are based are admittedly subsequent in point of time to the assignment claimed by respondent.

"The facts, in so far as they have any bearing upon the points involved in this appeal, are substantially as follows: The interveners Johnson and wife owned a vacant lot adjoining the building of the Pacific Nash Motor Company on Van Ness avenue in the city and county of San Francisco. The latter being desirous of increased building space, the following real estate transaction was promoted and consummated. The Blackmore Investment Company purchased from the Johnsons their lot for $15,000 cash, giving for the balance of the purchase price a promissory note secured by a second encumbrance upon the property, placed a building loan thereon as a first encumbrance, with the proceeds of the loan erected a building thereon and leased the premises to the Pacific Nash Motor Company. The agreement of lease between the Blackmore Investment Company and the Pacific Nash Motor Company provided for the deposit in escrow by the lessee of the sum of $18,000 to be paid to the lessor, upon the completion and acceptance of the building and the execution of the lease, to apply on the last year's

rental under the lease. Accordingly, on October 9, 1926, the Pacific Nash Motor Company deposited with the title company its check, drawn on the Wells Fargo Bank and Union Trust Company, in the sum of $18,000, payable to the order of the Blackmore Investment Company, together with instructions that the check be delivered to the latter upon the completion and acceptance of the building and the execution of the lease. Why this deposit was not made in the form of cash as required by the agreement does not appear, but apparently no objection was made to the form of the deposit.

"As the transaction for the purchase of the lot was originally contemplated, the $15,000 cash payment due the Johnsons as down payment was to be derived from this deposit of $18,000. This arrangement, however, not being satisfactory to the Johnsons, who insisted upon immediate payment, it became necessary, in order that the transaction be consummated, for the Blackmore Investment Company to raise the required sum of $15,000.

"The Blackmore Investment Company was a corporation, the entire capital stock of which, with the exception of a few qualifying shares, was owned by one F. P. Mozingo, who was its secretary and apparently in sole control of the affairs of the corporation. Actively participating in the promotion of the transaction was one J. L. Stewart, a licensed architect and acting as such in the designing of the building. The respondent Baumgarten was employed by Stewart as a draughtsman, on a salary and commission basis, in connection with the construction.

"According to the testimony of respondent, and as corroborated by that of Stewart, Mozingo explained to them both that he coudd not raise the $15,000 necessary to pay the Johnsons on the purchase price of the lot and suggested that they, Stewart and Baumgarten, advance that sum to the Blackmore Investment Company for that purpose, stating that if they would do so he would turn over to them the deposit of the Pacific Nash Motor Company above referred to. This was thereupon agreed to, respondent giving Stewart his check for $6,000, which Stewart, in company with Mozingo, took to his bank, where he, with respondent's $6,000 check and an additional $9,000 of his own money, purchased a cashier's check in the sum of $15,000, which

he gave to Mozingo. This check was deposited by Mozingo with the title company for payment to the Johnsons. At the time of agreeing to make the advance Stewart told Mozingo that respondent wanted something in writing about the assignment of the Pacific Nash Motor Company deposit and also that the fee of the structural engineer in connection with the construction of the building amounting to $1,500, for which he, Stewart, had become obligated, was due and should be paid. Accordingly Mozingo agreed to make the order in the amount of $16,500 to take care of both the advance and the engineering fees. Stewart further suggested to him that the order be made payable to respondent as he was the one who wanted it.

"Thereupon the following order was executed by Mozingo on behalf of the Blackmore Investment Company, one copy being delivered to the title company and the other to Stewart, who delivered it to respondent:

" 'San Francisco, California
" 'November 15, 1926

" 'California Pacific Title Insurance Co.,
" '148 Montgomery Street
" 'San Francisco, California

" 'Gentlemen :—

" 'For, and in consideration of certain moneys heretofore advanced to the Blackmore Investment Company, and for certain other services heretofore performed for the benefit of the Blackmore Investment Company you are herewith instructed to pay the sum of Sixteen Thousand Five Hundred ($16,500.00) Dollars to E. A. Wm. Baumgarten. This said sum of $16,500.00 is to be paid out of the deposit heretofore made with you by the Pacific Nash Motor Company to secure a lease to be entered into between the Blackmore Investment Company and the Pacific Nash Motor Company and which deposit amounts to the sum of Eighteen Thousand ($18,000.00) Dollars.

" 'The balance due out of the deposit of $18,000.00 namely $1,500.00 is to be paid to George Peak for services rendered in full, for negotiating the lease herein above referred to.

" 'It is understood, and you are hereby instructed to disregard any other orders, instructions, or demands on this

said deposit of $18,000.00 without the written consent of said E. A. Wm. Baumgarten being first had and obtained.

" 'Yours very truly,

" 'BLACKMORE INVESTMENT COMPANY,

" 'per F. P. MOZINGO, Secretary.'

"Thereupon, although the exact time thereof does not appear, Mozingo endorsed in blank on behalf of the Blackmore Investment Company the check on deposit with the title company.

"On May 23, 1927, and again on June 13, 1927, Mozingo, on behalf of the Blackmore Investment Company, instructed the title company to cancel and disregard the above order in favor of respondent. On June 20, 1927, he directed the title company to cancel his endorsement of the check and subsequently executed a purported assignment of the fund and check to appellant. Mozingo claimed as his reason for doing so, that Stewart had been amply repaid for the $15,000 out of excessive and secret architect's fees received from the contractor. No sufficient evidence to support this contention was, however, produced at the trial.

"The building was completed and accepted and the lease executed and thereupon on June 10, 1927, the title company cashed the check. Subsequently the $1,500, less the title company's charges, was paid to appellant's assignee pursuant to the second paragraph of the order. Due to the several conflicting claims to the balance of the $16,500 the title company refused to disburse it and respondent thereupon brought this action for its recovery.

"A considerable portion of appellant's briefs is devoted to a discussion of his version of the circumstances under which the advance of $15,000 was made and the order upon the title company executed and to the contention that Stewart by 'padding' the contract price has been more than compensated for any advances made. Appellant's contentions as to these matters are based upon conflicting testimony at variance with that of respondent and Stewart and which upon this appeal it must be assumed were determined by the trial court adversely to appellant.

"The above order, being one for the payment to respondent of a part only of the whole fund due the drawer and never having been accepted by the drawee, cannot be said to constitute a legal assignment, *pro tanto,* of the obliga-

tion due the Blackmore Investment Company or of any part thereof. (*Donohoe-Kelly Banking Co.* v. *Southern Pac. Co.*, 138 Cal. 183 [71 Pac. 93, 94 Am. St. Rep. 28]; *Fidelity Sav. etc. Assn.* v. *Rodgers,* 180 Cal. 683 [182 Pac. 426]; *Guggenhime & Co.* v. *Lamantia,* 207 Cal. 96 [276 Pac. 995, 997]; *Harlan* v. *Gladding, McBean & Co.,* 7 Cal. App. 49 [93 Pac. 400].)

"However, it has been repeatedly held that where an order, such as the one at bar, is given for a valuable and adequate consideration and with the intent to effect an assignment it will as between the payee and the drawer operate as an equitable assignment taking precedence over subsequent assignments and judgment liens. (*Wheatley* v. *Strobe & Wilcoxson,* 12 Cal. 92 [73 Am. Dec. 522]; *Pierce* v. *Robinson,* 13 Cal. 116; *Pope* v. *Huth,* 14 Cal. 403; *Curtner* v. *Lyndon,* 128 Cal. 35 [60 Pac. 462]; *McIntyre* v. *Hauser,* 131 Cal. 11 [63 Pac. 69]; *Fidelity Sav. etc. Assn.* v. *Rodgers, supra; Dunlap* v. *Commercial Nat. Bank,* 50 Cal. App. 476 [195 Pac. 688].)

"It is immaterial that there was no fund actually in the possession of the title company at the time of the execution of the order. The subject of the assignment was not the check or any particular fund of money, but was the right of the Blackmore Investment Company to receive the sum of $18,000 upon compliance with the terms of the escrow. Money to become due at a future time upon the happening of a contingency may be the subject of an assignment. (*Pope* v. *Huth, supra; Bridge* v. *Kedon,* 163 Cal. 493 [126 Pac. 149, 43 L. R. A. (N. S.) 404]; *Smitton* v. *McCullough,* 182 Cal. 530 [189 Pac. 686]; *Bank of Yolo* v. *Bank of Woodland,* 3 Cal. App. 561 [86 Pac. 820]; *Union Collection Co.* v. *Oliver,* 23 Cal. App. 318 [137 Pac. 1082].)

"The order was given for valuable and adequate consideration, to-wit: the advance of $15,000 by Stewart and respondent and the satisfaction of the indebtedness of the Blackmore Investment Company to Stewart in the sum of $1,500 on account of engineering fees. An antecedent indebtedness constitutes a valuable consideration sufficient to support an equitable assignment. (*Smitton* v. *McCullough, supra.*)

"That the order was intended by the parties as an assignment is in accord with the evidence. The agreement

of Mozingo was to 'turn over the deposit'. At the time of the delivery of the order Stewart said to Mozingo, 'Now it is understood that $16,500 of this money goes to Baumgarten and $1,500 goes to Pcak', and the latter replied, 'Yes, I will turn over the money to you fellows and I get the building.' In January of 1927, it was suggested to respondent by an official of the title company that he procure another order on a regular form of the title company. After signing this additional order Mozingo stated to respondent, 'Now you got it all, it is all yours now.' By endorsing the check the Blackmore Investment Company divested itself of any further control over the fund. The concluding paragraph of the order specifically agrees and instructs the drawee to disregard any other orders, instructions or demands on the fund without the written consent thereto of the payee. The trial court was amply justified in determining, as we must assume it did, that an assignment was intended.

"The situation at bar therefore comes within the rule as stated in *Guggenhime & Co.* v. *Lamantia, supra,* that 'Although neither a negotiable nor non-negotiable bill of itself constitutes an assignment, if it clearly appears from the entire transaction that it was the intention of the drawer and payee to transfer title to a chose in action, an assignment will be held to have taken place, and the nature of the transaction is not changed because the assignor in the course of the transaction may have delivered to the assignee an order upon the debtor.'

"An assignment having taken place, it was beyond the power of the assignor to revoke it and Mozingo's subsequent attempts to do so were ineffectual. It likewise takes precedence over the subsequent assignments and levies of execution which form the basis of appellant's claims to the fund. (*Title Ins. etc. Co.* v. *Williamson,* 18 Cal. App. 324 [123 Pac. 245, 247].)

"Appellant contends that the complaint does not state, nor do the findings of the trial court find, sufficient facts to support a judgment on the theory of an equitable assignment. The complaint alleges the agreement of lease, the deposit thereunder in escrow of the check of the Pacific Nash Motor Company in the sum of $18,000; the assignment to respondent of 'the sum of $16,500 of said fund of

$18,000'; the execution and delivery of the order directing the payment to respondent of the sum of $16,500 and the contemporaneous endorsement of the check; and that the 'assignment and order' were made in consideration of moneys advanced to the Blackmore Investment Company, at its instance and request, to be used and which were actually used in the purchase of the real property therein mentioned. It also contains a second count containing the usual allegations found in actions to quiet title. A general and special demurrer was filed by appellant and overruled by the trial court. Although it is true that the adequacy of the consideration is not definitely shown, there being no averment as to the amount of money advanced, the case was, as stated by appellant in his briefs, tried on the theory of an equitable assignment. The matter of the true consideration and its sufficiency and adequacy was fully gone into by all the parties, apparently without objection, upon the trial and determined to be as found by the trial court upon competent evidence, 'moneys advanced and services rendered to Blackmore Investment Co., at its instance and request, of the value of $16,500'. Both the evidence and the findings of fact show the assignment to be just and reasonable and the consideration therefor adequate.

█ "The complaint is contended to be further defective in that it alleges an assignment of 'the sum of $16,500 of said fund of $18,000', whereas in fact there was at the time of the assignment no fund in existence. The trial court properly found the assignment to be of all of the assignor's 'right, title and interest in and to its said claim against Pacific Nash Motor Company and the fund represented by said check, to the extent of $16,500 thereof'. And this is what the complaint, reading it in its entirety, alleges in effect. From the facts alleged it definitely appears that the subject of the assignment was neither the check nor a portion of any existing fund of money, but was rather a chose in action, to-wit: the claim of the Blackmore Investment Company against the Pacific Nash Motor Company.

█ "The failure of the complaint to allege that at the time of the commencement of the action the order was in force and effect and the plaintiff was the owner and holder of the assignment, is not fatal. It is alleged that the plaintiff is the owner of and entitled to possession of the sum

of money in dispute. His ownership in the assignment at the time of the commencement of the action is by 'fair intendment' shown. (*Irish* v. *Sunderhaus,* 122 Cal. 308 [54 Pac. 1113].)

"Respondent is not limited in his recovery to the sum of $6,000, which was the extent of his personal contribution to the consideration for the assignment. The Blackmore Investment Company received, for the assignment, adequate consideration of the value of $16,500. The assignment was made to respondent for the benefit of both respondent and Stewart. In so far as the extent of Stewart's interest therein is concerned, respondent is the trustee of an express trust and entitled to sue thereon in his own name. (Sec. 369, Code Civ. Proc.) The rule that every action must be prosecuted in the name of the real party in interest (sec. 367, Code Civ. Proc.) is subject to the further rule that a person with whom or in whose name a contract is made for the benefit of another, is a trustee of an express trust which permits him to sue with like effect as though he were the principal. (*Earl Fruit Co.* v. *Herman,* 90 Cal. App. 640 [266 Pac. 592].)

"Appellant complains that the findings of the trial court fail to find on the allegations of his cross-complaint. He does not, however, point out in his briefs the issues raised thereby which are not determined in the findings, nor does he point out in what manner he has been prejudiced from any failure to find thereon. However, in view of the conclusions reached by the trial court as to the validity of the assignment in favor of respondent, admittedly prior in point of time to the alleged assignment and judgment liens upon which appellant relies, findings as to the latter became immaterial and unnecessary. (2 Cal. Jur. 1032.)"

The judgment is affirmed.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 20, 1933.