UNION INDEMNITY COMPANY, a Corporation, Plaintiff, v. A. D. DRUMM, JR., INC., a Corporation; A. L. HAIGHT; STANDARD OIL COMPANY OF CALIFORNIA, a Corporation; E. C. PETERSON; E. C. PETERSON, as Controller of the State of Nevada; SHELL OIL COMPANY, a Corporation; SALT LAKE HARDWARE COMPANY, a Corporation; SYMES UTAH GROCERY COMPANY, a Corporation; AMERICAN FOUNDRY COMPANY, a Corporation; JOHN SCROWCROFT & SONS; JOHN M. TEDFORD; LUND & COMPANY; MOHAWK PETROL COMPANY, a Corporation; TEXACO OIL COMPANY, a Corporation; WESTERN PACIFIC RAILROAD COMPANY, a Corporation; M. PANOS; GUS ZAHARIS; C. H. STELCK; CLOYD BISHOFF and I. H. KENT COMPANY, a Corporation, Defendants and Respondents.

CHARLES L. HILL, Trustee of A. D. Drumm, Jr., Inc., a Bankrupt, Intervenor and Appellant.

AND

STATE OF NEVADA, on the Relation and to the Use of E. C. PETERSON, as State Controller, Plaintiff, v. A. D. DRUMM, JR., INC., a Corporation; UNION INDEMNITY COMPANY, a

CORPORATION; STANDARD OIL COMPANY OF CALIFORNIA, A CORPORATION; SHELL OIL COMPANY (NEVADA), A CORPORATION; THE WESTERN PACIFIC RAILROAD COMPANY, A CORPORATION; I. H. KENT COMPANY, A CORPORATION; THE TEXAS COMPANY, A CORPORATION; MOHAWK PETROL COMPANY, A CORPORATION; PETROL CORPORATION, A CORPORATION; M. PANOS; CLOYD BISHOFF; MORSE BROS.; I. E. ADAMS; J. N. TEDFORD; A. D. DRUMM, JR.; A. L. HAIGHT; SALT LAKE HARDWARE COMPANY, A CORPORATION; SYMES UTAH GROCERY COMPANY, A CORPORATION; JOHN SCROWCROFT & SONS, AND LUND & COMPANY, DEFENDANTS AND RESPONDENTS.

CHARLES L. HILL, TRUSTEE OF A. D. DRUMM, JR., INC., BANKRUPT, INTERVENOR AND APPELLANT.

No. 3092

December 3, 1936. 62 P. (2d) 698.

244

*Walter Rowson,* for Appellant:

*Platt & Sinai,* for Respondents The Texas Company and Standard Oil Company of California:

246

Thatcher & Woodburn, Forman & Forman and John Robb Clark, for Respondents Shell Oil Company (Nevada) and The Western Pacific Railroad Company.

## OPINION

Per Curiam:

On April 15, 1931, A. D. Drumm, Jr., Inc., hereinafter referred to as Drumm, was awarded a highway contract by the department of highways of the State of Nevada,

in the sum of $158,791.02. This contract was completed by Drumm and accepted July 15, 1932, at which time there was a balance due on the contract of $33,693.09. On the last-mentioned date Drumm owed on account of the contract something over $50,000. On July 20, 1932, Drumm assigned to the Standard Oil Company and to the Petrol Oil Company, of said $33,693.09 due from the highway department, an amount to cover their respective claims.

Before the jub mentioned was begun, the Union Indemnity Company executed its bond conditioned for the faithful performance of the contract by Drumm and to indemnify the State of Nevada against damages and for the payment by Drumm of all claims which he incurred on account of the performance of the contract.

On August 5, 1932, the indemnity company brought suit in the district court of Washoe County, Nevada, to restrain the payment to Drumm of the balance due on the contract and to compel its application to the payment of debts incurred by Drumm in performing the contract. To the complaint in this action, Drumm filed a general demurrer. In due time the demurrer was overruled, and thereafter default was entered for failure to answer. No motion to set the default aside was ever made, either by Drumm or the trustee hereinafter mentioned.

On January 30, 1933, the state controller filed a separate action in the district court of Ormsby County, Nevada, to compel all creditors of Drumm to interplead and set up their claims to the balance of $33,693.09 due Drumm. The actions were thereafter consolidated. Before judgment in either of the suits mentioned, and on January 31, 1933, an involuntary petition in bankruptcy was filed in the federal court, against Drumm, which was adjudicated a bankrupt, and on July 15, 1933, Charles L. Hill was chosen trustee in bankruptcy and duly qualified. On December 1, 1933, the trustee, without objection by any party, filed his complaint in intervention in the above actions, denying the alleged

equitable claim of liens, and denying the validity of the said assignments.

Upon the trial, judgment was rendered sustaining the assignments and the claim of equitable liens in favor of the job creditors.

The trustee has appealed from the judgment and the order denying a motion for a new trial.

On this appeal the trustee raises two questions: First, have the job creditors a lien on the balance unpaid on the contract? and, second, has the trustee in bankruptcy, in any event, the right to administer the unpaid balance?

Prior to disposing of the questions raised by appellant, we will consider the contention made by respondents to the effect that the trustee represents Drumm—having, as they say, stepped into his shoes—and not having applied to the trial court to vacate the default theretofore entered against Drumm, is in no position to resist the contentions made by respondents, and, in fact, has no right to prosecute this appeal.

Without pretending to know what the courts have held, or what the law is, we have assumed that the trustee in bankruptcy generally represents both the bankrupt and the creditors. However, we need not decide this point, for the reason, as urged by appellant in his reply brief, it was not made in the trial court. Paterson v. Condos, 55 Nev. 260, 30 P. (2d) 283.

We will now consider the contention that the lower court erred in adjudging that an equitable lien exists in favor of the job creditors in question, to the exclusion of the general creditors.

Our preconceived predilection on this point was in favor of the contention of respondents, and it was not without considerable difficulty that we are led to abandon that view. In presenting this question, both sides quote from the bond given by Drumm, as well as from our statute pertaining to the letting of contracts by the department of highways, hereinafter referred to as the department. Respondents rely chiefly upon cases in

the federal courts to sustain their position, and the trial court founded its opinion on this point upon the following federal decisions: Henningsen v. United States F. & G. Co., 208 U. S. 404, 28 S. Ct. 389, 52 L. Ed. 547; In re Scofield Co. (C. C. A.), 215 F. 46; Belknap Hardware & Mfg. Co. v. Ohio River Contract Co. (C. C. A.), 271 F. 144.

Our highway act (Stats. 1917, chap. 169, p. 309, as amended by Stats. 1925, c. 132, pp. 216, 217, section 5337 N. C. L., as amended by Stats. 1931, c. 210, p. 359, sec. 1) provides for the letting of contracts, and for the giving of a bond by the successful bidder, with sureties, conditioned, among other things, that "two-thirds of such bond to be conditioned that such work under the contract shall be performed in accordance with the plans and specifications and the terms of contract, and one-third of such bond to be conditioned as an additional protection for labor, material and supplies furnished" or used about the performance of the work under the contract, and for the payment of any obligations incurred by the contractor in fulfilling the terms of his contract. The act also provides that any creditor of any such contractor, whose claim has not been paid, and who desires to be protected under said bond, shall file a claim within thirty days from the completion of the contract with the department, and that any person filing such claim may at any time within six months thereafter commence an action against the surety on the bond. Section 15 of the said act as originally enacted (Laws 1917, c. 169, p. 315) authorized the highway engineer to make partial payments to any contractor, not to exceed 85 percent of the contract price, in advance of full completion and acceptance of the work. Said section 15 (N. C. L. sec. 5338) was amended by Stats. 1931, c. 210, p. 362, sec. 2, as above pointed out, so as to provide for the completion of the work in case the contractor defaulted, and to further provide: "That such retained percentage as may be due any contractor shall be due and payable at the expiration of the thirty-day period as hereinafter

provided for filing of creditors' claims, and such retained percentage shall be due and payable to the contractor without regard to creditors' claims filed with the state highway department."

The federal cases relied upon are no doubt sound in principle, but they are not applicable to the facts in the instant case, for the reason that the statute pursuant to which the contract and bond in question were executed contain language not contained in the federal statute considered in those cases. For instance, our statute provides, as above shown, that the retained percentage held by the department upon the completion of a contract "shall be due and payable to the contractor without regard to creditors' claims filed with the state highway department." There was no such provision in the federal act considered in the federal cases.

Counsel for appellant, in his opening brief, devoted several pages to the language of the statute just quoted, insisting that the fact that it was not embodied in the act of 1917, and the further fact that there was no similar provision in the federal act construed in the federal cases relied upon, is enough to justify this court in rejecting respondents' theory. Notwithstanding this fact, none of the briefs filed in behalf of the respondents comment on this contention of appellant.

Why the very able counsel who filed briefs in behalf of the respective respondents made no comment on the contention of appellant, just mentioned, is, to our mind, significant. However, it seems to us that the contention of appellant is irresistible. The original highway act did not contain this provision, and it was amended in 1925 so as to incorporate it in the act. As has often been pointed out by this court (Escalle v. Marks, 43 Nev. 172, 183 P. 387, 5 A. L. R. 1512) we must look to the intent of the legislature in amending a statute. What could have been the intent of the legislature in 1925 in amending the highway law as pointed out? The language of this amendment seems so clear

that there can be no room for construction. By providing that the retent shall be payable to the contractor without regard to creditors' claims filed with the department, it must follow that, where the contract is completed, the retent must be paid to the contractor. We see no escaping this conclusion, for the language is not susceptible to any other construction. It is very evident that the legislature concluded that the one-third of the bond given for the protection of those furnishing labor and supplies was ample, and that, where claims were filed, the parties should be left to their recourse in the courts. The bond provides that the department, with the written consent of the contractor, may use any money in its hands belonging to the contractor to pay claims against him. If this language means anything, it is that the contractor has exclusive right to the fund. The legislature did not and could not anticipate that a widespread depression would occur, carrying down to disaster and insolvency bonding companies, along with other financial institutions. The amendment was an unfortunate one, but the court must apply the law as it finds it. But counsel for respondents make the point that, since the highway act provides that one-third of the bond shall be conditioned as "additional protection" for those furnishing labor and supplies, the legislature contemplated that such persons were protected by an equitable lien. However potent this contention might have been prior to the amendment mentioned, such amendment, in our opinion, completely negatives this theory. Under the highway law as it exists, we cannot escape the conclusion that no equitable lien exists in favor of respondents, the job creditors.

■ Appellant concedes that the assignments given by Drumm are valid, but insists that the amounts thus assigned should, along with the balance due Drumm, go into the hands of the trustee, to be administered. We fail to see the force of this contention. Certainly the case of Straton v. New, 283 U. S. 318, 51 S. Ct. 465, 75

L. Ed. 1060, does not sustain it. That case holds, it is true, that the trustee is entitled to all property owned by the bankrupt at the time of the adjudication, even though there be a lien upon it. In the instant matter, the assignments passed title to the funds in question more than four months before the petition in bankruptcy was filed. In the case of a mere lien, the trustee has an equity to protect. Not so where absolute title has passed. In the situation in question, the federal court never acquired jurisdiction over the amount assigned.

Many pages of the transcript of the record are carbon copies. Rule IV provides that when the transcript is typewritten it shall be the first impression. Appellant cannot recover costs for these copies. But for the circumstances of the case, we would penalize appellant for using the carbon copies. Nellis v. Johnson, 57 Nev. 18, 57 P. (2d) 392, 393.

It is ordered that this case be remanded to the trial court with instructions to modify its judgment to conform to the views herein expressed.

It is further ordered that the respondents Standard Oil Company of California and Petrol Corporation recover their costs. Appellant to recover costs against other respondents except as above indicated.

### ON PETITION FOR REHEARING

March 18, 1937.

*Per Curiam:*

Good cause appearing therefor, it is hereby ordered that a rehearing is granted as to Shell Oil Company and The Texas Company only, and that the same is hereby set down for oral argument on the 22d day of April, A. D. 1937, at ten o'clock a. m.

### ON REHEARING

July 31, 1937. 70 P. (2d) 767.

254

*Platt & Sinai,* for Respondent The Texas Company:

*Thatcher & Woodburn* and *Forman and Forman,* for Respondent Shell Oil Company (Nevada) :

**OPINION**

*Per Curiam:*

We granted a rehearing in the above-entitled case as

to all of the respondents except the Standard Oil Company and the Petrol Corporation. 62 P.(2d) 698.

There is no complaint of the facts as stated in our former opinion, which was based upon the theory that the intention of the parties should control and that they were bound by the intention and spirit of the legislative enactments pursuant to which the contract between the highway department and Drumm, as well as the undertaking, were executed. Believing then that such was a sound basis on which to work out the matter, we did not deem it necessary to state or consider the general rules usually invoked to determine whether or not an equitable lien exists. In fact, neither counsel invoked fundamentals, but relied upon decisions.

At this time we feel that it would be wise to state the general principles which a court must apply to determine if an equitable lien accrues, though there is no controversy as to them. These rules are clearly and concisely stated in 3 Pom. Eq. Jur. (4th ed.) at sections 1234 to 1238, inclusive.

As is made clear by the author named, an equitable lien may arise out of either an express or an implied contract. If it arises out of an express contract, the intention to create a lien must *clearly* appear. See, also, 37 C. J. 315–320. Lord Hardwicke, in Deacon v. Smith, 3 Atk. 323, reviewed the previous English authorities, and said: "In all these cases the courts have gone upon the intention of the parties." If it arises out of an implied contract, the *attendant circumstances* must *clearly* indicate an *intention* of the parties to create a lien on specific property. A mere moral obligation alone is not sufficient to support an equitable lien. Professor Pomeroy said: "When equity has jurisdiction to enforce rights and obligations growing out of an executory contract, this equitable theory of remedies cannot be carried out, unless the notion is admitted that the contract creates some right or interest in or over specific property, which the decree of the court can lay hold of, and by means of which the equitable relief can be made

efficient. The doctrine of 'equitable liens' supplies this necessary element; and it was introduced for the sole purpose of furnishing a ground for the specific remedies which equity confers, operating upon particular identified property, instead of the general pecuniary recoveries granted by courts of law. It follows, therefore, that in a large class of executory contracts, express and implied, which the law regards as creating no property right, nor interest analogous to property, but only a mere personal right and obligation, equity recognizes, *in addition to the personal obligation,* a peculiar right over the thing concerning which the contract deals, which it calls a 'lien,' and which, though not property, is analogous to property, and by means of which the plaintiff is enabled to follow the identical thing, and to enforce the defendant's obligation by a remedy which operates directly upon that thing. The theory of equitable liens has its ultimate foundation, therefore, in contracts, express or implied, which either deal with or in some manner relate to specific property, such as a tract of land, particular chattels or securities, a certain fund, and the like. It is necessary to divest one's self of the purely legal notion concerning the effect of such contracts, and to recognize the fact that equity regards them as creating a charge upon or hypothecation of the specific thing, by means of which the personal obligation arising from the agreement may be more effectively enforced than by a mere pecuniary recovery at law." 3 Pom. Eq. Jur. (4th ed.), sec. 1234.

Whatever else may be said in this case the very basis of any right to a lien—if any exists—is the contract between the highway department, Drumm, and respective claimants, and the undertaking, subject, of course, to the statutory provisions pertaining to the letting of such contracts, to which we called attention in our former opinion.

Many authorities are cited in support of the contention that an equitable lien exists in favor of the respondents, some involving questions of the federal bankruptcy

law (11 U. S. C. A. sec. 1 et seq.). As we view this case, there is just one question involved, namely: Did respondents acquire an equitable lien pursuant to the general principles of equity?

■■ To our mind there is absolutely no circumstance in this case warranting the holding that an equitable lien accrued in favor of respondents. In fact, if the well-known general rules of equity pertaining to equitable liens—the very ones invoked by respondents and conceded to be correct by appellant—should control, no act that the parties did or could do subsequent to the furnishing of the labor or material, as the case may be, could create an equitable lien. In this connection it may be said that no circumstance, fact, or act is relied upon by any of the creditors who applied for a rehearing that is peculiar to himself. Nor are the court proceedings instituted by the bonding company, referred to in the former opinion, of consequence, for they could not create a lien, where equity gave none. All that a court can do in any situation is to adjudge that the contract, express or implied, proprio vigore, creates a lien.

In Pennsylvania Oil P. R. Co. v. Willrock P. Co., 267 N. Y. 427, 196 N. E. 385, it is said that to find (note the word "find") an equitable lien it is necessary that an intention to create such a charge clearly appear from the language and the attendant circumstances.

In James v. Alderton Dock Yards, 256 N. Y. 298, 176 N. E. 401, 403, which was an action to recover a commission for selling certain property pursuant to contract, and to have an equitable lien established, the court said: "Nothing in his contract for services gives him such a lien. Viewing the testimony in the most favorable light, all the plaintiff had from the corporation was a promise to pay him well for his services in negotiating a sale of the defendant's property to the dock company. There is no suggestion that he was to be paid out of any specific property or that the mortgage or any other funds were to be assigned to him or subjected to

a lien for his commissions. His agreement is no different than that of any other broker or agent for commissions. His work and labor created a debt due him from the defendant, and to collect this debt his action at law was adequate. No elements in his arrangements with the defendant bring his claim within the rule which permits the courts to enforce payment by fixing a lien upon specific property."

In Carmichael v. Arms, 51 Ind. App. 689, 100 N. E. 302, 304, the court said: "In order that a lien may be created by contract, express or implied, it is generally necessary that the language of the contract or the attendant circumstances should clearly indicate an intention of the parties to create a lien upon the specific property."

In the same case the court quotes approvingly from Lyster's Appeal, 54 Mich. 325, 20 N. W. 83, as follows: "Courts cannot create liens. They can only declare and enforce them when they exist, either in law or equity."

The supreme court of Tennessee is in accord with this quotation, as appears from Stansell v. Roach, 147 Tenn. 183, 246 S. W. 520, 526, 29 A. L. R. 143, which was a case in which Stansell sought to have an equitable lien declared in preference to other creditors. The suit grew out of a contract to perform certain services. The value of the services was fixed and the services were performed as agreed. We quote at length from the opinion:

"We do not understand that an equitable lien can be based alone upon moral obligations, but it must find a basis in established equitable principles. While it is quite true, as stated by Chancellor Cooper in Brown v. Bigley, 3 Tenn. Ch. 618, the inclination of the courts of this country, and of none more so than those of this state, has been to enlarge the doctrine of equitable liens and charges, with a view to the attainment of the ends of justice, without much respect for the technical restrictions of the common law. Nevertheless,

we must find as a basis therefor some recognized principle. The only theory of equity advanced is that the services of Stansell produced the fund, and that under his contract he looked to the fund alone for compensation, and not to any obligation of his principal in person. We think neither of these propositions is maintainable. In the first place, Stansell did not produce the fund. It came by virtue of an appropriation by Congress. It may be quite true—and we think it is—that Stansell rendered valuable services but for which Congress would not have been moved to act. Still it cannot be said that the fund was procured by an individual in such a sense as to give him any equitable right to any portion thereof. In the next place, the evidence does not show that Stansell looked to the fund alone for his compensation, nor, indeed, that he was to have any part of the fund. His contract was, in the event Congress made the appropriation, he was to be paid, for his services in connection with bringing it to the attention of Congress, his expenses and 10 per cent, of the amount of the appropriation. He was not to receive a part of the appropriation itself. It is true whether he received anything depended upon the appropriation being made, but this is only a means for arriving at the amount which he was to be paid. The witnesses who testify with respect to the contract use this language: 'We all agreed we would pay Mr. Stansell 10 per cent. of the amount which he succeeded in getting the government to pay, and in addition each pay his proportionate part of the expenses incurred by him.'

"If the contract be construed so as to mean that the appropriation itself should be set apart for Stansell's services, it would come dangerously near violating the statute prohibiting the transfer of claims against the United States. The lien cannot be based upon an express executory agreement whereby an intention is indicated to make some particular property or fund security for a debt, for the reason there was no such

express contract. Neither is it necessarily implied from the terms of the agreement. The rule of law seems to be that an agreement of that sort must be either expressed or necessarily implied without any reliance upon the person responsible or the owner of the claim of which the fund was the result. Walker v. Brown, 165 U. S. 654, 17 S. Ct. 453, 41 L. Ed. 865. An equitable lien does not necessarily involve a right which is the basis of a possessory action in the thing itself, but it must be a right over the thing itself. Pom. (4th ed.) § 165. It does not follow simply because the agent renders a valuable service enabling his principal to obtain his own.

"It is contended by Stansell's counsel that he stands in the same situation as an attorney at law. Conceding this to be true, his right to the lien does not follow. An attorney may be entitled to assert a lien upon a judgment which he has represented his client in obtaining, but a principal basis for allowing a lien to an attorney at law is that it is deemed both natural and wise that the lawyer be secured in the fruits of his professional labor, since the proper administration of justice is essential to the well-being of the public, which cannot be secured without an intelligent and prosperous bar. Brown v. Bigley, supra. Usually where the services of an attorney have been recognized as an equitable lien, the services have been performed in connection with court proceedings, and judgment has been obtained in favor of his client. An attorney for a defendant, however great the value of his services, and however much property he may have enabled his client to save, has no lien on his client's property by virtue of equitable principles."

In Connecticut Co. v. New York, etc., R. Co., 94 Conn. 13, 107 A. 646, 653, the court quotes approvingly from 1 Jones on Liens (3d ed.), sec. 28, as follows: "In courts of equity the term 'lien' is used as synonymous with a charge or incumbrance upon a thing where there is

neither jus in re nor ad rem nor possession of the thing. The term is applied as well to charges arising by express engagement of the owner of the property and to a duty or intention implied on his part to make the property answerable for a specific debt or engagement."

In the same case the court quotes approvingly from Westall v. Wood, 212 Mass. 540, 544, 99 N. E. 325, as follows: "If the arrangement between the parties, interpreted in the light of the conditions in which they were placed, indicates a contemporaneous intention to adjust their rights upon a basis which can be established only by resort to the equitable principle of lien or pledge, then, in the absence of an intervening adversary interest, such an intent will be executed in chancery."

Mr. Justice White, in Fourth Street National Bank v. Yardley, 165 U. S. 634, 17 S. Ct. 439, 442, 41 L. Ed. 855, dwelt at length on the necessity of the existence of an intent to create an equitable lien. He quoted from an opinion by Lord Hatherly in Thomson v. Simpson, L. R., 5 Ch. 659, as follows: " 'It is extravagant to say that a man who has an agent employed to pay bills creates a charge on the funds in the agent's hands by the mere drawing of a bill. It is necessary to make out a contract to charge specific funds which were with the agent, or which were on their road thither; for, if there was only a personal contract, that would give nothing but a right of action.' In the same case, Lord Justice James observed (page 662) that 'when it is attempted to make out, in addition to the written contract contained in a bill of exchange, a collateral parol agreement, it is most important to have clear and satisfactory evidence as to the exact words used.' "

These cases lay down what seems to be the safe and sound rule which should guide us in determining whether or not an equitable lien attached upon the furnishing of supplies and labor to Drumm in the performing of the work on the contract in question.

In the first place, there must be a specific fund

against which a lien can vest. This question is not discussed and we do not decide if there is a specific fund, but simply observe that so far as the facts show the balance due Drumm was to be paid out of the general funds from which such claims are paid, and it is questionable if a balance due and payable to Drumm from such a fund is a "specific fund." This point has never been discussed, so far as we know, and we merely mention it in passing.

We come now to the question of whether or not there is anything in the statute, contract, and undertaking clearly indicating an intention to create an equitable lien. In our former opinion, 57 Nev. 242, 62 P.(2d) 698, we reached the conclusion that there was not. That we might feel kindly disposed in favor of respondents is not enough. We must lay down a rule for future guidance of the courts, as well as litigants, and we must, so far as possible, adhere to well-established principles.

The contract between the department and Drumm, which includes the statute and the undertaking, is an express contract; hence, according to all authorities, it must *clearly* appear that there was an intention to create a lien in favor of the materialmen and laborers. What is there clearly indicating such an intention? We strove eagerly to find such intention when our former opinion was written. We have laboriously sought to find something upon which we could base such a conclusion now, but without avail.

Nowhere do counsel for respondents direct our attention to any language in the statute, contract, or undertaking which in our minds indicates clearly, dimly, or at all, that it was the intention of any of the parties that an equitable lien should attach to any money which might become due Drumm pursuant to his contract.

Paraphrasing the language used in James v. Alderton Dock Yards, supra, which expresses the idea in all of the cases: Viewing the testimony in the most favorable light, all that respondents had from Drumm was an

implied promise to pay them for their services and supplies. There is no suggestion that they were to be paid out of any *specific* fund. Their agreement is no different than that of any other laborer or merchant who provides labor or supplies on an implied contract.

In the instant case there is not even a contention that it was the intention of Drumm and claimants that claimants were to be paid by Drumm out of the money received pursuant to his highway contract. No circumstance in the dealings between Drumm and claimants is pointed to as indicating the slightest intention to create a lien in favor of any of them.

Respondents contend, of course, that the provision in the statute supplies the intention necessary. What is there that *clearly* indicates such intention? And it must clearly appear before we can so hold. Our attention is directed to the provisions relative to the retention by the department and the provision of the bond to the effect that one-third of such bond be conditioned as an additional protection for labor, etc.

As to the retained percentage, the statute expressly points out the course to be pursued by claimants; that is, that they file their claim within a given time, and after that period expires that the retent shall be paid to the contractor. Can we override the express provision of the statute particularly in view of the amendment of 1925 (Stats. 1925, c. 132), and Stats. 1931, c. 210, alluded to in our former opinion? If we can, we are not only a judicial but also a legislative body.

Coming to the provision as to the bond, its sole purpose must have been to provide security to Drumm's creditors, in addition to its financial and moral worth. This must be true, because no lien can attach to a highway or other property of the state or a subdivision thereof. Neither the state nor the department is under legal or moral obligation to pay claimants, nor is it so contended or intimated; hence it must be clear that our conclusion is the only interpretation to be placed upon those words.

In response to an inquiry by the court during the oral argument, counsel stated that the case of Philadelphia Nat. Bank v. McKinlay, 63 App. D. C. 296, 72 F.(2d) 89, holds to the contrary, but we fail to find anything in that decision to sustain the contention. We will advert to that case later on.

Counsel for respondents rely chiefly upon federal decisions to sustain their contention, and all of those cases hark back to the case of Henningsen v. United States F. & G. Co., 208 U. S. 404, 28 S. Ct. 389, 52 L. Ed. 547; and, as strange as it may seem, that was not a case in which the question of the right to an equitable lien was involved, but whether a surety which was compelled to and did make payments due from a defaulting contractor could be subrogated to the rights of the contractor in preference to a bank which loaned money to the contractor to use "as he saw fit, either in the performance of his building contract *or in any other way,*" as the court points out.

The next case strongly relied upon is that of Belknap Hardware & Mfg. Co. v. Ohio River C. Co. (C. C. A.), 271 F. 144, 147. The court deals with the question of subrogation, and the right of laborers and materialmen, analogous, as it says, to a lien. It then observes: "Mechanic's lien statutes evidence a general recognition of the thought that those who contribute the labor and material going into a structure should have a claim against it for what they have furnished in preference to other creditors of the builder, though the equitable distinction, between those materialmen who are unpaid today and the banker who furnished the money which was used to pay those who furnished material yesterday, seems rather arbitrary. It is commonly held that this lien or priority is wholly statutory, and we are not aware of any case (unless those hereafter discussed) where, without the aid of any contract or statute, this vague equity of materialmen and laborers has been thought sufficient to put the owner of the property under

obligation to see that they were paid before he settled with the contractor."

Does the acknowledgment of a "vague equity of materialmen and laborers" measure up to the well-recognized rule that it must *clearly* appear that it was the intention of the parties and the legislature to create an equitable lien? We think not. The word "vague" indicates great doubt of an equitable claim. Furthermore, in that very case the court said: "Obviously, the retained fund is devoted to the payment for such labor and material as may be necessary to finish the work after the contractor defaults." Such a view could not influence us in the case in hand, for the reason that the contractor did finish the contract.

 It then dwells upon "what may have been the congressional intent" in requiring a bond, and holds that the laborers and materialmen were subrogated. To entitle one to a lien, it is not sufficient that it "may have been the legislative intent to create an equitable lien." Such intent must *clearly* appear.

The case of United States Fidelity & Guaranty Co. (the Surety) v. Sweeney (C. C. A.), 80 F. (2d) 235, is one in which the surety took from the contractor subrogation agreements and indemnity contracts, by which the contractor agreed to assign to the surety all the deferred payments and percentages and any and all moneys and properties that may be due and payable to the contractor at the time of the default or thereafter, for the construction of highways. When it became evident that the contractor was in default for some of the labor and materials used under the contracts, it was agreed that all retained percentage and deferred payments on the contract should be deposited to the joint account of the construction company and the surety. It was further agreed that as a check upon payments all accrued bills on the contractor should be paid by check of the contractor drawn against this deposit and countersigned by the surety, which was

done until December 10, 1932, on which date an involuntary petition in bankruptcy was filed against the contractor and it was adjudged a bankrupt.

Prior to the bankruptcy the contractor completed its contract. The money involved in that case is the balance on deposit at the time of the filing of the petition in bankruptcy. This is a controversy between the surety and the trustee in bankruptcy. The court held that the surety was bound by contract to pay the claims for labor and material, and upon paying these claims was entitled to be subrogated. Such is not the situation here.

It is true that the court in that case made a broad statement to the effect that the laborers and materialmen were entitled to an equitable lien, as did the court in the Belknap Case, basing their conclusion, apparently, upon the decision in the Henningsen Case, supra, where the facts and the opinion showed that the court was simply dealing with the question of subrogation, which involves different principles of law from what are involved in determining if an equitable lien exists. Why the federal courts should have seized upon the Henningsen Case to justify the sustaining of a claim of an equitable lien, when the question was not involved and none of the principles of an equitable lien were discussed, is beyond our understanding, for, as said in Falconer v. Stevenson, 184 Wash. 438, 51 P. (2d) 618, 619: "The doctrine of equitable lien has its prescribed boundaries as well as that of subrogation; it is not a limitless remedy to be applied according to the measure of the conscience of the particular chancellor any more than, as an illustrious law writer said, to the measure of his foot."

The case of Philadelphia Nat. Bank v. McKinlay, 63 App. D. C. 296, 72 F.(2d) 89, 91, above referred to, seems to accept the general contention of respondents, but it is evident that the court gave the question scant consideration, for it says that "we do not need to invoke that doctrine here," for reasons given.

As to the federal decisions, it is admitted that there is considerable confusion. Judge Sanborn, in Martin v. National Surety Co. (C. C. A.), 85 F. (2d) 135, 140, observed: "There is unquestionably authority for the proposition that laborers and materialmen have no rights superior to those of general creditors of a contractor in anything due the contractor except perhaps retained percentages. * * * Much of the confusion comes from the fact that, in deciding the case of Henningsen v. United States Fidelity & Guaranty Co., 208 U. S. 404, 28 S. Ct. 389, 52 L. Ed. 547, the supreme court did not make it clear whether the surety, who had paid labor and material claims and whose rights were held to be superior to those of a general creditor holding an assignment from the contractor, was subrogated to the rights of laborers and materialmen or subrogated to the rights of the contractor as of the time the bond was written, and whether, if the surety was subrogated to the rights of laborers and materialmen, such rights extended beyond retained percentages and included all deferred payments due upon the completion of the contract. It is to be hoped that in a proper case the supreme court will take occasion to clarify the situation, so that it may be definitely known what equitable rights laborers and materialmen have in addition to their rights under a public contractor's bond, and whether such rights, if any, are limited to retained percentages or apply to progress payments as well."

 Counsel contend that an equitable lien may be declared under the broad principles of equity; that is, that equity regards as done that which ought to be done. The rule applicable to this theory is qualified by Professor Pomeroy in the following language: "In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate

with sufficient clearness an intent that the property so described, or rendered capable of identification, is to be held, given or transferred as security for the obligation." Pomeroy's Eq. Jur. (4th ed.), sec. 1235.

As we have pointed out, there is no clear intention manifested that a lien should exist.

After a careful consideration of the principles which control in determining whether or not an equitable lien exists, and applying them to the facts of this case, we are of the opinion that it does not appear that there was any intention to create an equitable lien as contended. Had there been such an intention, it could have been expressed in the statute or contract in a few words.

It is ordered that the judgment appealed from be reversed.