COMMERCIAL CREDIT CORPORATION, Appel-
lant, *v.* JAMES J. MATTHEWS and JAMES J.
MATTHEWS, dba MATTHEWS CONSTRUC-
TION COMPANY, L. V. REDFIELD, and
JACQUES MORVAY, Respondents.

No. 4384

JAMES J. MATTHEWS and JAMES J. MATTHEWS
dba MATTHEWS CONSTRUCTION COMPANY,
Appellants, *v.* COMMERCIAL CREDIT COR-
PORATION, L. V. REDFIELD and JACQUES
MORVAY, Respondents.

No. 4381

October 5, 1961                    365 P.2d 303

(Rehearing in each appeal denied November 3, 1961.)

*George Folsom* and *Goldwater, Taber & Hill,* of Reno,
for Commercial Credit Corporation.

*Belford, Anglim & Brown,* of Reno, for James J.

Matthews and James J. Matthews dba Matthews Construction Company.

*Peter Echeverria,* of Reno, for Respondent L. V. Redfield.

*Lohse & Fry,* of Reno, for Respondent Jacques Morvay.

**OPINION**

By the Court, McNAMEE, J.:

This is an action for a declaratory judgment commenced by Commercial Credit Corporation for the purpose of determining the rights of certain parties in a trust fund. The lower court determined that Morvay's assignee, Redfield, and Matthews were entitled to the substantial part of the fund, and that Commercial Credit Corporation was not entitled to any part thereof. From this decision the two present appeals result: one by Commercial Credit, the nature of whose claim is hereinafter set forth in detail; the other by Matthews who claims, in addition to what was allowed him by the lower court, rights to Morvay's interest in the trust fund paramount to Redfield.

On February 4, 1954, Morvay and Matthews entered into a contract pertaining to the development of a housing subdivision which provided that they would divide equally between them the net profit from the construction and sale of houses in the subdivision. At that time Morvay was conducting a building supply business.

On February 5, 1954, Matthews, as owner of the land in the subdivision, entered into a contract with Alland & Co., a building contractor, for the construction of 76 houses in said subdivision for the sum of $7,350 per home. Globe Indemnity Co. furnished a completion bond in favor of Matthews. Morvay, without consulting Matthews, agreed in writing to indemnify Globe for any loss it might suffer under said bond, apparently for the purpose of obtaining supply orders from Alland for the job.

On July 12, 1954, Morvay and Matthews entered into

two contracts with Nevada Bank of Commerce, one of which pertained to interim financing by the bank, hereinafter called "interim financing agreement." The other consisted of a trust agreement wherein Matthews and Morvay were trustors and the bank was trustee. The bank was to hold certain profits resulting from the sale of houses for distribution equally to Morvay and Matthews. The substance of these agreements of July 12, 1954 was that with respect to each house constructed, as proof of progress was presented to the bank, the bank was authorized to advance to Alland & Co. and others not more than $8,000 for the construction of each house and as each house was sold and the sales price was paid into the bank, any amount received by the bank on the sale of a house over the sum of $8,000 was the profit which went into the trust fund.[1]

On February 2, 1955, Morvay, for money advanced, assigned to Redfield all moneys then in the trust fund and any moneys thereafter deposited in such fund to which he would be entitled. A copy of this assignment was served the same day on the Nevada Bank of Commerce. Matthews had no knowledge of this assignment until approximately September 8, 1955.

On March 7, 1955, Alland & Co. defaulted. Evidently, the $7,350 per house received from the bank was insufficient to cover the amount for which Alland & Co. had agreed to build each house; in other words, it was losing on each house and could no longer continue operations. At that time Alland & Co. owed several thousand dollars to Morvay Building Supplies, Inc., (Morvay had incorporated himself on October 1, 1954) for supplies furnished Alland & Co. in the performance of its building contract and for funds advanced Alland to meet payroll obligations. Globe and Matthews agreed upon a certain amount as a settlement under said bond, which amount was insufficient to pay all of the claims against Alland

---

[1]Certain other expenses not connected with construction were, under said interim financing agreement, to be deducted also from the amount so received before any profit on an individual house would go into the trust fund.

& Co., and the debt from Alland & Co. to the Morvay corporation remained unsatisfied.[2]

On March 24, 1955, because of such default of Alland & Co., Morvay, as an individual, entered into an independent contract with Matthews under which Matthews would act as general contractor in completing the houses not already sold, and Morvay agreed to pay all sums then due for labor performed on or materials furnished to said job prior thereto, and Morvay further agreed to pay all costs necessary for the completion work. Matthews in his opening brief (No. 4381) admits that the obligations assumed by Morvay under the agreement of March 24, 1955 were not payable out of the trust fund.

In order to pay such costs of completion assumed by Morvay as aforesaid, Morvay had the Morvay corporation enter into a financing agreement with Commercial Credit Corporation, dated April 11, 1955, wherein Commercial Credit agreed to advance the necessary money to the Morvay corporation for the completion. As security for such advances the Morvay corporation assigned to Commercial Credit certain of its accounts receivable. The two we are concerned with are (a) the said account receivable from Alland & Co. which resulted from materials purchased from the Morvay corporation prior to the default of Alland & Co. (see Footnote 2), and (b) the account receivable from Matthews, which is the result of purchases by Matthews from the Morvay corporation after the default of Alland & Co.[3] Matthews first learned of such assignment on August 30, 1955, and immediately notified Commercial Credit that he owed Morvay nothing.

Morvay, as an individual, and the Morvay corporation are both insolvent.

---

[2]Under his indemnity agreement with Globe and the agreement of March 24, 1955 mentioned hereinafter, Morvay was obligated to satisfy this debt or assume the loss, whether it was owed to Morvay as an individual or to a corporate entity.

[3]Under the March 24, 1955 agreement these purchases should have been charged to the account of Morvay.

Because the Morvay corporation owes Commercial Credit under its financing agreement of April 11, 1955, Commercial Credit seeks to satisfy such indebtedness by claiming Morvay's and Matthews' interests in the trust fund to the extent of such assigned accounts.

Matthews claims he is entitled not only to his interest in the trust fund but also to Morvay's, at least to the extent of Morvay's indebtedness to Matthews resulting from their said agreement of March 24, 1955.

Redfield claims he is entitled to the entire interest of Morvay in the trust fund by virtue of the Morvay-Redfield assignment.

As heretofore stated, the lower court denied Commercial Credit any relief and awarded, subject to certain deductions, all of Morvay's interest in the trust fund to Redfield. In doing so, the court denied the claim of Matthews to any part of Morvay's interest.

The lower court expressly found that the Morvay corporation was not an entity separate from Morvay, and it dealt with the Morvay corporation and Morvay, the individual, as one and the same legal entity. We have determined from the evidence that this finding by the lower court was correct, whether or not such a determination was necessary in view of our conclusions herein.

Our main problem on these appeals is to construe the said trust agreement of July 12, 1954. This agreement provides in part:

"* * * the TRUSTORS above named do hereby authorize and direct that upon the closing of each individual sales escrow * * * all monies remaining after payment of the costs and charges as provided in that certain Agreement dated the 12th day of July, 1954 [the interim financing agreement]⁴ * * * shall be deposited in the Trust Department, Nevada Bank of Commerce, Reno, Nevada, in trust nevertheless and

⁴The interim financing agreement makes no reference to payments of costs and charges connected with construction. The only costs and charges specified therein pertain to financing, repayment of loans, insurance premiums, and escrow fees.

subject to the uses and purposes hereinafter provided, to-wit:

"1. To pay Isbell Construction Co. in accordance with that certain contract between James Matthews and Isbell Construction Co. dated the 13th day of April, 1954, to be paid upon written approval of Isbell Construction Co. and James J. Matthews, subject to a ten (10%) percent retention, which retention shall become due and payable thirty-five (35) days after completion of all work, and upon completion of said work to the satisfaction of the Veterans Administration, or Federal Housing Administration and the City of Reno.

"2. To retain such sums of money as shall be specified by the Veterans Administration or Federal Housing Administration until such time as the Veterans Administration or the Federal Housing Administration shall authorize the release of the same.

"In the event, for any reason construction is stopped in the development of said subdivision[5] then and in that event, the TRUSTEE shall proceed as follows, to-wit:

"A. Pay to Nevada Title Guaranty Company the sum of SIXTEEN and 10/100 ($16.10) DOLLARS for each dwelling house constructed in said subdivision for legal fees and documentary stamps.

"B. Pay all taxes due and payable and all outstanding construction costs as approved by TRUSTEE and TRUSTORS; however, in the event of a disputed claim the TRUSTORS shall be responsible for the settlement of same by Court action or otherwise, during which time the TRUSTEE may deposit the sum in dispute with H. K. BROWN, County Clerk, until the dispute is settled.

"C. Pay any balance remaining due to L. V. Redfield on the indebtedness in the total sum of THIRTY–TWO THOUSAND ($32,000.00) DOLLARS invested by the said L. V. Redfield, less all sums paid out of down payments.

---

[5]The lower court found that the default of Alland & Co. did not constitute a stoppage "in the development of said subdivision" within the meaning of this paragraph.

"D. Pay Henry Hartman any remaining balance due on his investment of EIGHT THOUSAND ($8,000.00) DOLLARS, less all sums paid out of down payments, and to pay to Henry Hartman an agreed addition sum of TEN THOUSAND ($10,000.00) DOLLARS, to be paid upon the termination of this trust in accordance with the provisions of this agreement.

"E. Pay George E. Miller any remaining balance due on his contract with James J. Matthews for work actually completed.

"F. Pay Isbell Construction Co. any remaining balance due on its contract with James J. Matthews for work actually completed.

"In the event the monies in said trust are insufficient to pay all of the obligations first immediately hereinabove provided, then each of the last five items hereinabove named shall be paid on a pro-rata basis, at which time the TRUSTORS shall then be given sixty (60) days within which to pay into the hands of the TRUS-TEE sufficient funds to enable TRUSTEE to pay all outstanding liabilities due under the terms of this Trust Agreement, and upon the payment of said liabilities then said balance of monies or lots shall be delivered or transferred to the TRUSTORS as may then be jointly directed in writing signed by the TRUSTORS herein and said trust shall be terminated.

"Upon the completion of construction of seventy-six (76) houses * * * the closing of seventy-six (76) sales escrows, and the payment of all obligations as in this Trust Agreement provided * * * then any remaining monies or lots shall be delivered or transferred to the TRUSTORS as may then be jointly directed in writing signed by the TRUSTORS herein and said trust shall then be terminated.

"IT IS AGREED that in the event construction proceeds in an orderly manner, obligations are paid as same become due and a sufficient reserve is accumulated to cover any remaining obligations contracted for development of said subdivision, then TRUSTEE may release any sum or sums over the sum of the obligations,

to the TRUSTORS as may be jointly directed in writing signed by the said James J. Matthews and Jacques Morvay."

Commercial Credit argues that it was the intention of the parties to the trust agreement (Morvay, Matthews, and the Nevada Bank of Commerce) that said agreement was to guarantee the payment of all construction costs arising out of the building project, and therefore Commercial Credit, as assignee of the said Alland and Matthews accounts, should be paid to the extent of said accounts out of the trust fund before any payments as profits could be made to the persons entitled thereto. It is conceded that said accounts resulted from the purchase of materials from or money advanced by the Morvay corporation, all of which materials and money went into the housing project.[6]

Although Commercial Credit Corporation was not a party to the trust agreement and disclaims any interest in the trust fund as a third-party beneficiary, it does maintain, however, that the trust agreement gives it an equitable lien against the trust fund to the extent of the assigned accounts. This claim is based upon the wording of the last paragraph of the trust agreement above quoted and, particularly, the words "and a sufficient reserve is accumulated to cover any remaining obligations contracted for development of said subdivision." In our opinion, "any remaining obligations contracted for development of said subdivision" refers to the obligations specifically enumerated in the trust agreement and the interim financing agreement, both dated July 12, 1954.

We are fortified in this conclusion by the admitted facts in the record resulting from the pre-trial conference wherein the parties admitted the truth of the following:

"On July 12th, 1954, the defendants, James J. Matthews and Jacques Morvay, as trustors, created a

---

[6]But as heretofore noted the payment had been assumed by Morvay for those materials furnished and the money advanced which these assigned accounts represent.

trust with the Nevada Bank of Commerce, as trustee, for the payment of costs and charges in connection with the construction of homes in the Hempstead Gardens Subdivision, and other obligations therein designated. Said trust agreement provided that any moneys remaining in the trust after the payment of the obligations designated in the trust agreement should be paid to the trustors, James J. Matthews and Jacques Morvay."

In order for an equitable lien to arise out of the trust agreement the intention to create such a lien must clearly appear. Union Indemnity Co. v. Drumm, 57 Nev. 242, 62 P.2d 698, 70 P.2d 767.

In stating this rule, the opinion on rehearing in the Drumm case italicizes the word "clearly." There is nothing in the trust agreement which would justify a holding that the parties thereto *clearly* intended to create an equitable lien in favor of laborers or materialmen. In fact, the evidence leads us to conclude that Morvay and Matthews by the two contracts of July 12, 1954 contemplated that all obligations for labor and materials would be paid by the general contractor, to wit, Alland & Co., out of the moneys released by the bank under the July 12, 1954 interim financing agreement or, in the event of a default by the general contractor in this regard, by the bonding company. After making the payments to Alland & Co., or as directed by it, in the amount of $7,350 per house as aforesaid, the bank was not required by the trust agreement to pay or cause to be paid any other amounts to Alland's laborers, materialmen, or subcontractors. The agreement of March 24, 1955, under which Matthews became the general contractor in the place of Alland & Co., was executed after the trust agreement and of course was not within the contemplation of the parties at the time of the execution of the trust agreement. It did not purport to modify the trust agreement.

There is nothing in the record to indicate that for

repayment to it of the sums it was to advance, Commercial Credit relied on anything other than the corporate credit of Morvay Building Supplies, Inc., and the accounts assigned to it by the Morvay corporation as security. In fact, the record fails to disclose that Commercial Credit had any knowledge of any of the agreements made by Morvay and Matthews with the Nevada Bank of Commerce.

The record shows that two representatives of Commercial Credit Corporation during their investigation of Morvay Building Supplies, Inc., went to the Nevada Bank of Commerce. Sanders, one of these representatives, testified as follows:

"Q. What was the nature of your investigation in the trust department?

"A. In the trust department? There was no investigation in the trust department. I was just talking to someone there who was introduced to me at that time.

"Q. Then other than this one visit to the Nevada Bank of Commerce which you spent with the manager and Mr. Spottiswoode, that's the only time you contacted the Nevada Bank of Commerce?

"A. That is the only time I was in contact with the Nevada Bank of Commerce, correct."

Pritchard, a field operations supervisor for Commercial Credit Corporation, testified as follows:

"Q. Now, working on that close time schedule, when you went to the Nevada Bank of Commerce did you ask to see any agreements that the Nevada Bank of Commerce had with respect to this particular subdivision?

"A. I did not."

In other words, Commercial Credit, after inquiry as to the financial standing of Morvay Building Supplies, Inc., was satisfied to contract with it relying solely upon its personal credit secured only by the assignment of the said accounts receivable. The only remedy of Commercial Credit Corporation, therefore, is its common law action against the Morvay corporation or against the credits assigned to it by the Morvay corporation

to the extent they could have been enforced by the assignor, Morvay Building Supplies, Inc. The situation here is no different from that in James v. Alderton Dock Yards, 256 N.Y. 298, 176 N.E. 401, 403, where the New York court said: "Nothing in his [plaintiff's] contract for services gives him such a lien. Viewing the testimony in the most favorable light, all the plaintiff had from the corporation was a promise to pay him well for his services in negotiating a sale of the defendant's property to the dock company. There is no suggestion that he was to be paid out of any specific property or that the mortgage or any other funds were to be assigned to him or subjected to a lien for his commissions. His agreement is no different than that of any other broker or agent for commissions. His work and labor created a debt due him from the defendant, and to collect this debt his action at law was adequate. No elements in his arrangements with the defendant bring his claim within the rule which permits the courts to enforce payment by fixing a lien upon specific property."

No representation was made to Commercial Credit Corporation that for moneys advanced by it to Morvay Building Supplies, Inc., repayment would be made from any specific fund. The bank made no such representation and there is nothing in the record to show that Morvay made such a representation. The evidence does not show that Commercial Credit, prior to the commencement of this action, looked to the trust fund for repayment of any part of the sums advanced to the Morvay corporation. As stated in the Drumm case: "No circumstance in the dealings between Drumm and claimants is pointed to as indicating the slightest intention to create a lien in favor of any of them." [57 Nev. 242, 70 P.2d 771.]

We are of the opinion that the evidence and the trust agreement as we interpret it do not show an intention on the part of the makers of the trust agreement to create an equitable lien as contended by Commercial Credit Corporation and that the conclusion of the trial

court in this regard is correct. The judgment that Commercial Credit Corporation take nothing by its action must be affirmed.

The separate appeal of Matthews (No. 4381) is from that part of the judgment which directs the Nevada Bank of Commerce to pay from the trust fund to Redfield, as assignee of Morvay, $2,000 for financing, $2,000 for costs advanced, and one half of the remainder of the trust fund; to Matthews the other remaining half of the trust fund less the sum of $562.50, being Matthews' pro rata share of the special master's fee; and to Lawrence J. Semenza, as special master, the sum of $1,125.

It is Matthews' contention that inasmuch as Morvay under the various agreements herein mentioned is indebted to Matthews in a sum in excess of one half of the trust fund, the entire trust fund should go to him less an allowance to the special master.

Because Matthews' opening brief is the only brief filed in this appeal, he has filed a motion for an order reversing those portions of the judgment "which award Redfield as assignee of Respondent Morvay the sum of $2,000 for financing, the sum of $2,000 for costs advanced and one half of the amount remaining in the trust fund after the payment of certain charges." It is his contention that Redfield's failure to file an answering brief is a confession of error.

In Toiyabe Supply Co. v. Arcade Dress Shop, Inc., 74 Nev. 314, 330 P.2d 121, the respondent filed no answering brief. The opinion therein states: "Under these circumstances this court may, in its discretion, regard the default of the respondent as a confession of error, and reverse the judgment as to the appellants without consideration of the merits of the appeal. * * * In our view this is an appropriate case for such method of disposition."

One record on appeal serves as the record for both of the appeals herein, and the two appeals were consolidated for argument; thus this court has reviewed

the entire record. Although a brief on behalf of Redfield undoubtedly would have been helpful to the court, we believe that under the circumstances here existing it is appropriate for us to determine on the merits the rights of Matthews and Redfield in the trust fund.

The said motion for reversal is therefore denied.

The trust fund held by the Nevada Bank of Commerce, according to the findings of the trial court, amounts to $58,797.13. In addition there is accrued interest. All of the construction work has been completed and all obligations specified in the trust agreement have been paid. There are no claims or demands against this fund other than those of the parties hereto. We have already determined that the claim of Commercial Credit is without merit.

The trust agreement provides that upon completion of the housing project and the payment of all the specified obligations, the money remaining in the trust fund shall be distributed to the trustors and the trust terminated.

Morvay divested himself of any interest in the trust fund by his assignment of such interest to Redfield. The trial court concluded that the claim of Redfield, as assignee of Morvay, to Morvay's interest in the trust fund is superior to any claim Matthews might have to such interest, because the assignment was made before the claims of Matthews against Morvay had arisen. Matthews contends that this conclusion is erroneous.

The legal question presented by such contention is whether rights accruing to a contracting party (Morvay) under his contract (trust agreement) with another (Matthews) for the payment of money in the future, which rights he has assigned to a third party (Redfield), are subordinate to those claims of his (Morvay's) creditors which arise subsequent to the assignment.

Under the agreement of March 24, 1955, Morvay, as aforesaid, agreed to pay all sums then due for labor performed and materials furnished plus all costs to be incurred for completion. Morvay, on or about April 20, 1954, had obligated himself to pay certain construction

costs through his indemnity agreement with Globe. It appears that his obligation in this regard was limited to the extent of Globe's liability on the Alland completion bond and that Globe had paid Matthews a sum of money in settlement of its liability under the bond. This obligation insofar as Matthews is concerned has been satisfied. Thus we are concerned only with the effect if any of the agreement of March 24, 1955 on the Redfield assignment. As hereinbefore stated, the agreement of March 24, 1955 did not purport to modify the trust agreement.

Under the agreement of March 24, 1955, Matthews became at a later date a creditor of Morvay for an amount in excess of one half of the trust fund.

We recognize the rule that after a contract is made, rights created by it are assignable, even though enjoyment of those rights is postponed to a future time. Commercial Life Ins. Co. v. Wright, 64 Ariz. 129, 166 P.2d 943; Baumgarten v. California Pacific T. & T. Co., 127 Cal.App. 649, 16 P.2d 332; Wike v. Board of Trustees, 229 N.C. 370, 49 S.E.2d 740; Restatement, Contracts, Sec. 154(1). The assignee is entitled to priority over the claims of subsequent creditors of the assignor, even those creditors who become such without notice of the assignment. In re Allied Products Co., 6 Cir., 134 F.2d 725. As stated in 4 Corbin, Contracts, Sec. 874, p. 503: "[The assignee] is not defeated by the mere fact that the assignor makes a second assignment after the money has become due or that other creditors have made advances to the builder in ignorance of the assignment and in the belief that they could attach the money to be earned." See 4 Corbin, Contracts, Sec. 903 (1961 Supp.) where the case of Rockmore v. Lehman, 2 Cir., 129 F.2d 892, and other related cases are analyzed.

We thus conclude as did the trial court that Redfield's rights as the assignee of Morvay to Morvay's share of the trust fund are superior to the claim of Matthews

as Morvay's creditor which claim arose subsequent to the Redfield assignment.

Matthews asserts it was error for the trial court to allow Redfield, as assignee of Morvay, $2,000 for financing and $2,000 for costs advanced. These were sums which were specified in the interim financing agreement to be paid Morvay from the trust fund, and thus this assertion is without merit.

The judgment directs that Lawrence J. Semenza be paid from the trust fund the sum of $1,125 for his services as special master. The amount for Semenza's services is not disputed. Although Matthews has appealed from this part of the judgment, his brief makes no mention of such allowance and does not assign such allowance as error. We therefore deem it unnecessary to consider this part of the judgment appealed from.

Matthews although making no specification as an error of law in his brief that the special master's report was in part erroneous, does mention some individual items which he claims should have been charged against Redfield's share of the trust fund. This claim however is based on the false premise that his rights under the March 24, 1955 agreement are superior to the Redfield assignment, which we have herein decided to the contrary. For this reason we are not inclined to consider the several items in the report of which he complains.

No error appearing in either appeal, the judgment in all respects is affirmed.

BADT, C. J., and BROWN, D. J., concur.

Thompson, J., being disqualified, the Governor designated Honorable Merwyn H. Brown, Judge of the Sixth Judicial District, to sit in his stead.

DOLLAR INVESTMENT CORPORATION, Appel-
lant, *v.* MODERN MARKET, INC., Respondent.

No. 4394

October 10, 1961                                      365 P.2d 311

(Rehearing denied November 13, 1961, 77 Nev. 397,
365 P.2d 1117.)

*George Rudiak*, of Las Vegas, for Appellant.

*Samuel S. Lionel*, of Las Vegas, for Respondent.

# OPINION

By the Court, THOMPSON, J.:

The parties will be referred to as Modern and Dollar. This is an action on a written contract for the sale and purchase of a market. By stipulation, the sole dispute concerns the inventory of groceries and liquor and the method used to determine the price to be paid therefor.

Modern, seller, requests judgment against Dollar, buyer, for the sum of $13,755.43 claimed to be the balance due under the following paragraph of their contract:

"The grocery inventory shall be based on the retail price of groceries, less the average grocery percentage gross profit as disclosed for the period set forth in the financial statement of the Seller dated January 31, 1958." Dollar denied any obligation to pay the amount claimed and, by counterclaim, asked that the quoted paragraph be reformed, because of mutual mistake and fraud, to reflect the true understanding of the parties. The district court found for Modern, and entered judgment in the amount of $13,755.43, with interest and costs. Dollar appeals.

The financial statement of seller referred to in the mentioned paragraph reflected the percentage of gross profit to be 19.12 percent. Soon after consummation of the written contract, a retail cost inventory was taken disclosing a value of $59,645.99. That value, less the percentage of gross profit, pegged the purchase price at $48,241.68. It is agreed that Dollar had paid $34,486.25. The difference between the last two figures, to wit, $13,755.43, is the amount for which judgment was entered.

Dollar has assigned many errors. With but one exception to be later discussed, each claim of error attacks the

sufficiency of the evidence to sustain the findings of fact and legal conclusions made by the lower court. In this regard, Dollar's contentions may be summarized as follows: First, that the evidence clearly shows the true agreement to be that the purchase price of the grocery inventory was to approximate the wholesale cost thereof, represented by seller to be about $40,000; that the formula provided by the written contract to take the inventory at retail and reduce the figure thus obtained by 19.12 percent was intended to approximate the wholesale cost; that the percentage gross profit figure of 19.12 percent was too low, as established by expert accounting testimony, resulting in a greater purchase price than intended by the parties. Second, that the evidence clearly shows that Dollar wanted to take the inventory at wholesale, but was induced by Modern to agree to the method adopted because of the latter's representation that the result would be substantially the same.

In its brief and oral argument, Dollar recognizes a conflict in the evidence as to each contention. Notwithstanding such conflict, it insists that, as equitable relief of reformation is sought, our duty is to weigh the evidence and direct the entry of a proper judgment. As to this, it is first noted that the complaint does not seek equitable relief; reformation is sought in defense and by counterclaim. In any event, we have heretofore held that we will not disturb the findings of court or jury when supported by substantial evidence, and it makes no difference whether the case be at law or in equity. Close v. Flanary, 77 Nev. 87, 360 P.2d 259, 263; Agricultural Insurance Co. v. Biltz, 57 Nev. 370, 382, 64 P.2d 1042, 1046.

There is substantial evidence to support the findings and judgment. As indicated, there was a direct conflict as to the basic contentions heretofore mentioned. Gordon, president of Modern, testified that he believed the inventory at wholesale cost would run about $55,000

(not $40,000) and so advised Silverman, president of Dollar. Furthermore, Gordon testified that it was agreeable with him to determine price on a wholesale cost inventory basis, but that Silverman was anxious to take possession immediately, resulting in their joint decision to the quicker method of a retail price inventory less percentage of gross profit.

In addition to this testimony creating a direct conflict with Dollar's theory of the case, there is much evidence, undisputed, to which the lower court apparently gave credit. Without detailing it all, and by way of example only, such evidence established that Silverman, the buyer's president, had been in the grocery business for years, knew merchandising and the customary procedure for buying and selling inventory on hand. The formula set out in the written contract had been thoroughly discussed before an attorney was selected to reduce their understanding to written form. The financial statement therein referred to was delivered to Silverman and, in turn, to his accountant for analysis, before the written contract was prepared. Silverman expressed to seller his satisfaction with that financial statement. Silverman reviewed all aspects of the proposed sale and purchase with his attorney before directing preparation of the necessary documents. The first draft of the sale and purchase contract was altered in certain respects relating to penalty, but was not found incorrect regarding the paragraph here in question. With such evidence before it, the lower court could properly find that the paragraph in controversy correctly stated the parties' intended agreement.

The remaining assignment of error attacks the allowance of interest at 7 percent per annum from August 2, 1958. Dollar claims that the amount of money due under the contract was unliquidated until rendition of final judgment, and that interest was allowable only from date of judgment, August 26, 1960. Dollar relies upon Agricultural Insurance Co. v. Biltz, supra, as authority for this contention. That case is not in point. The policy

of insurance upon which suit was based expressly provided that the loss would not become payable until a satisfactory proof of loss was received by the company, including an award by appraisers. There was no satisfactory proof of loss, or valid award by appraisers, with the result that plaintiff's demand was, in fact, unliquidated until rendition of judgment.

No. 4394

November 13, 1961          365 P.2d 1117

*George Rudiak*, of Las Vegas, for Appellant.

*Samuel S. Lionel*, of Las Vegas, for Respondent.

